**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AFFIRMATIVE INSURANCE | ) | Case No. 15-_____ (___) |
| HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF MICHAEL J. MCCLURE IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Michael J. McClure, hereby declare under penalty of perjury, pursuant to section 1746

of title 28 of the United States Code, that:

1.      I have served as Chief Executive Officer of Affirmative Insurance Holdings, Inc.

("HoldCo" and, together with each of its wholly-owned direct and indirect subsidiaries that are

debtors and debtors in possession in these chapter 11 cases, the "Debtors" or "Affirmative")

since October 1, 2013, and as HoldCo's principal financial officer since October 2, 2015.  I

previously served as HoldCo's Acting Chief Executive Officer from April 4, 2013 to October 1,

2013, and as HoldCo's Chief Financial Officer from December 1, 2007 to September 10, 2013.

In these capacities, I have become familiar with the Debtors' day-to-day operations, business,

and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and filed

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Affirmative Insurance Holdings, Inc. (0432); Affirmative Management Services, Inc. (7252); Affirmative Services, Inc. (7255); Affirmative Underwriting Services, Inc. (7250); Affirmative Insurance Services, Inc. (8823); Affirmative General Agency, Inc. (2345); Affirmative Insurance Group, Inc. (7246); and Affirmative, L.L.C. (2347).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 150 Harvester Drive, Suite 250, Burr Ridge, Illinois 60527.

the motions described herein requesting certain relief (the "First Day Pleadings").  I submit this

declaration on behalf of the Debtors in support of the Debtors' chapter 11 petitions and the First

Day Pleadings.

3.      The Debtors are operating their businesses and managing their properties as

debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

Contemporaneous with the filing of this declaration, the Debtors have requested procedural

consolidation and joint administration of the above-captioned chapter 11 cases (these "Chapter

11 Cases").

4.      The First Day Pleadings seek, among other things, to ensure the continuation of the

Debtors' cash management systems and other business operations without interruption, and

establish certain other administrative procedures to promote a smooth transition into these

Chapter 11 Cases.

5.      Except as otherwise indicated herein, all of the facts set forth in this declaration are

based upon my personal knowledge, information supplied to me by other members of

Affirmative's management or professionals, information learned from my review of the relevant

documents, or my experience and knowledge of the Debtors' operations and financial condition

and the insurance industry, generally.  If called as a witness, I could and would testify to the facts

set forth in this declaration.  I am authorized to submit this declaration on behalf of the Debtors.

## BACKGROUND

6.      Founded in June 1998, Affirmative provides non-standard personal automobile

insurance ("NSPAI") policies for individual consumers in targeted geographic markets.

7.      Affirmative's NSPAI policies are written by its state-regulated insurance

subsidiaries (the "Regulated Entities"), which are not Debtors in these Chapter 11 Cases.  Prior

to the Petition Date, the Regulated Entities were (and in one instance, soon will be) placed into rehabilitation by the various domiciliary states exercising regulatory authority over them.

8.      The Regulated Entities rely on the Debtors for the services necessary to conduct business operations, including, but not limited to, services related to personnel, accounting, tax and auditing, legal services, risk management, human resources, treasury functions, and investment services.

**I.      Overview of the Debtors' Business**

9.      NSPAI policies provide coverage to drivers who find it difficult to obtain insurance from standard automobile insurance companies due to their lack of prior insurance, age, driving record, limited financial resources, or other factors.  The majority of customers who purchase Affirmative's NSPAI policies do not qualify for standard policies because of financial reasons, such as the failure to maintain continuous coverage or the lack of flexible payment options in the standard market.

10.      In general, customers in the NSPAI market have higher average premiums than customers who qualify for the standard market, which results from the increased frequency of loss costs and transaction expenses, which is partially offset by the lower severity of losses resulting from lower limits of coverage.

11.      Affirmative offers a wide range of coverage options, including liability-only policies as well as full coverage policies, which include first-party coverage for the insured's vehicle.

12.      The means through which Affirmative distributes NSPAI policies has changed over the past several years, during which time Affirmative has sold or ceased certain business operations.

13.     Until September 30, 2013, Affirmative distributed NSPAI policies through a network of approximately 200 retail stores owned by Holdco, as well as an established network of independent agencies and multiple unaffiliated underwriting agencies.  The retail stores also provided premium financing services and distributed other insurance products and services provided by third parties, such as motor club memberships and pre-loaded debit cards.

14.     Affirmative's various unaffiliated underwriting agencies design, distribute, and service the NSPAI policies underwritten by Affirmative.  At various times in its history, Affirmative has issued NSPAI policies that were sold through unaffiliated underwriting agencies with established customer bases in order to capture business in markets other than those targeted by Affirmative's own internal underwriting agencies.  In these instances, Affirmative collects fees as compensation both for the use of the Regulated Entities' certificates of authority to transact insurance business in selected markets, as well as for assuming the risk that the unaffiliated underwriting agency will continuously and effectively administer these policies.

15.     On September 30, 2013, Holdco sold its retail agency distribution business to Confie Seguros Holding II Co. and Confie Insurance Group Holdings, Inc. (the "Retail Purchaser").  From that date until June 30, 2015, Affirmative distributed NSPAI policies through an established network of independent agencies and one unaffiliated underwriting agency writing business in California.  For the fiscal year ended December 31, 2014, gross premiums managed were distributed through the following channels:

| | |
|---|---|
| Former Retail Agencies | 40.1% |
| Other Independent Agencies | 37.0% |
| Unaffiliated Underwriting Agency | 22.9% |

16.     As of the fiscal year ending December 31, 2014, Affirmative was distributing NSPAI policies through approximately 5,000 independent agents or brokers and employed 489 employees.

17.     On June 30, 2015, Affirmative sold its internal underwriting agencies (or managing general agency ("MGA") operations)[2] (the "MGA Sale") to the same entity that purchased the retail distribution agencies in September 2013.  Upon closing of the MGA Sale, Affirmative entered into agreements with the purchaser of the MGA operations to provide for the continued distribution and servicing of Affirmative's NSPAI policies.

18.     As of June 30, 2015, Affirmative continued to distribute NSPAI policies through an unaffiliated underwriting agency in California.  However, on September 2, 2015, Affirmative entered into a Stipulated Cease and Desist Order with the California Department of Insurance, which required Affirmative to cease writing any new NSPAI policies and to commence non-renewing all in-force policies in accordance with California law.

19.     Subject to the restrictions imposed by the respective rehabilitators of the Regulated Entities, Affirmative is currently distributing NSPAI policies through its former MGA operations now owned by the Retail Purchaser in six states—Alabama, Illinois, Indiana, Louisiana, Missouri, and Texas.

## II.     Organizational Structure

20.     The organizational chart attached hereto as Exhibit A illustrates the Debtors' organizational structure.

---

[2] Managing general agents perform certain functions ordinarily handled only by state-regulated insurance entities, such as binding coverage, underwriting and pricing, appointing retail agents in a particular area, and settling claims. MGAs are beneficial to insurance entities because the MGA's expertise is not always available within the insurance entity's home office, and would be more expensive to develop in-house.

21.     HoldCo is a holding company with no business operations.  HoldCo has 75,000,000 shares of authorized common stock, of which 18,802,220 are issued and 16,008,357 are outstanding.  In addition, HoldCo has 25,000,000 shares of authorized preferred stock, none of which are issued or outstanding.

22.     HoldCo's common stock was traded on the NASDAQ Global Select Market until it was delisted in 2012.  Since its delisting, HoldCo's common stock has been traded exclusively in the over-the-counter market.

23.     As of April 15, 2015,[3] New Affirmative LLC, an affiliate of JCF AFFM Debt Holdings L.P. (the Debtors' second lien lender), beneficially owns 48.7% of HoldCo's common stock.  Other significant HoldCo common stock owners include Long Meadow Investors, LLC, Michael J. Moss, Long Meadow Holdings, L.P., and Jonathan W. Old, III, which collectively beneficially own 18.5%, and Red Mountain Capital Partners LLC, which beneficially owns 5.3%.

24.     HoldCo's direct and indirect subsidiaries include:

(a) four Regulated Entities, which are licensed to write insurance policies in various states;[4]

(b) Affirmative Insurance Group, Inc. ("AIGI"), which is a shell holding company for the Regulated Entities;

(c) two servicing entities that provide services to the Regulated Entities (the "Servicers");[5]

(d) two investment entities that hold commercial real property for two of the Regulated Entities (the "Investment Entities");[6]

---

[3] April 15, 2015 was the record date set by HoldCo's board of directors for its most recent annual meeting of shareholders.

[4] The Regulated Entities are (i) Affirmative Insurance Company ("AIC"); (ii) Affirmative Casualty Insurance Company; (iii) Affirmative Direct Insurance Company; and (iv) Affirmative Insurance Company of Michigan.

[5] The Servicers are (i) Affirmative Management Services, Inc. ("AMSI") and (ii) Affirmative Services, Inc. ("ASI").

(e) two underwriting entities that served as the managing general agency operations prior to the MGA Sale (the "Underwriting Entities");[7]

(f) Affirmative Underwriting Services, Inc. ("AUSI"), which is a shell holding company for the Underwriting Entities;

(g) Affirmative, L.L.C. ("ALLC"), which is a shell holding company for business operations that Affirmative purchased in 2007, which operations have since been transferred to other Affirmative entities; and

(h) two Delaware trusts that issued trust preferred securities and hold junior subordinated debt securities issued by HoldCo (the "Trusts").[8]

25.     HoldCo, the Underwriting Entities, the Servicers, AUSI, AIGI, and ALLC are Debtors in these Chapter 11 Cases.  Although the Regulated Entities and Investment Entities are not Debtors in these Chapter 11 Cases, they are currently (or soon will be) subject to state rehabilitation proceedings, as discussed in more detail below.

26.     The Regulated Entities possess the certificates of authority necessary to transact insurance business and issue policies.

27.     The Servicers are party to a Services Agreement, dated January 1, 2004 (the "Services Agreement"), with the Regulated Entities (except for Affirmative Direct Insurance Company),[9] pursuant to which the Servicers provide various services to the Regulated Entities, including services related to, among others, personnel, accounting, tax and auditing, legal services, risk management, human resources, treasury functions, and investment services.  Under

---

[6] The Investment Entities are Affirmative Real Estate Investment, LLC and 1500 Main, L.L.C.

[7] The Underwriting Entities are (i) Affirmative Insurance Services, Inc. ("AISI") and (ii) Affirmative General Agency, Inc. ("AGAI").

[8] The Trusts are Affirmative Insurance Holdings Statutory Trust I ("Trust I") and Affirmative Insurance Holdings Statutory Trust II ("Trust II").

[9] Affirmative Direct Insurance Company is a shell insurance company with no active business or operations.

the Services Agreement, the Regulated Entities are obligated to reimburse the Servicers for the actual costs incurred by the Servicers in rendering the services.

28.     Prior to the Petition Date, AIC confirmed that it will continue to fund the Debtors' operations pursuant to the Services Agreement and an agreed-to budget.

**III.     Capital Structure**

29.     Affirmative has approximately $100 million of long term debt outstanding, which consists of the following:

    (a)     approximately $15 million of second lien debt;

    (b)     approximately $36 million of junior subordinated debt securities due March 15, 2035;

    (c)     approximately $30 million of junior subordinated debt securities due June 15, 2035; and

    (d)     approximately $20 million of floating rate subordinated notes due March 15, 2035.

30.     The Debtors estimate that they have approximately $8.5 million of other unsecured debt outstanding (excluding intercompany debt), which is comprised mostly of outstanding tax liabilities, trade debt, and approximately $2.33 million that is allegedly owed as a purchase price adjustment in connection with the MGA Sale.

31.     The Debtors' First Lien Debt (as defined below) was satisfied in full shortly prior to the Petition Date in connection with the MGA Sale.

32.     The Debtors are party to equipment finance leases with Dell Financial Services L.L.C. and Cisco Systems Capital Corporation, and the amounts due thereunder are secured by the leased equipment.  As of the Petition Date, there are no amounts outstanding under such leases.

33.     First Lien Debt.  HoldCo is party to that certain Credit Agreement, dated
September 30, 2013, between HoldCo, as borrower, certain lenders party thereto, Credit Suisse
AG, Cayman Islands Branch, as administrative agent and collateral agent ("Credit Suisse"), and
Credit Suisse Securities (USA) LLC, as sole book runner and sole lead arranger, pursuant to
which the lenders thereto agreed to make a loan to HoldCo in a principal amount not to exceed
$40 million (the "First Lien Debt").

34.     Prior to the MGA Sale, the First Lien Debt was secured by a first priority lien on
substantially all of the Debtors' assets, and was guaranteed by all of the Debtors (except HoldCo,
which was the borrower).  In connection with the MGA Sale, the First Lien Debt
($29,700,660.44 outstanding at the time) was satisfied in full, and all UCC financing statements
that were filed in connection with the First Lien Debt have been terminated.

35.     Second Lien Debt.  HoldCo is party to that certain Second Lien Credit Agreement,
dated September 30, 2013, between HoldCo, as borrower, certain lenders party thereto, and JCF
AFFM Debt Holdings L.P., as administrative agent and collateral agent ("JCF"), pursuant to
which the lenders thereto agreed to make a loan to HoldCo in a principal amount not to exceed
$10 million (the "Second Lien Debt").

36.     Prior to the MGA Sale, the Second Lien Debt was secured by a second priority lien
on substantially all of the Debtors' assets, and was guaranteed by all of the Debtors (except
HoldCo, which was the borrower).  In connection with the MGA Sale, JCF released all of its
liens on the assets that were sold pursuant to the MGA Sale.  As of September 30, 2015, the
aggregate amount of principal and interest outstanding under the Second Lien Debt was
$15,518,789.13.

37.    <u>Junior Subordinated Debt Securities due March 15, 2035</u>.  On December 17, 2004, Trust I issued $30 million of trust preferred securities (the "<u>Trust I TruPS</u>") in a private placement pursuant to that certain Capital Securities Purchase Agreement, dated December 17, 2004, between Trust I, HoldCo, and Alesco Preferred Funding VI, Ltd.

38.    Trust I used the proceeds from the sale of the Trust I TruPS, together with HoldCo's initial capital contribution to Trust I of $928,000 that was made in exchange for 928,000 common securities issued to HoldCo by Trust I, to purchase approximately $30.9 million of HoldCo's junior subordinated debt securities (the "<u>2004 Securities</u>"), which were issued pursuant to that certain Indenture, dated December 21, 2004, between HoldCo and The Bank of New York Mellon Trust Company, National Association, as successor trustee to JPMorgan Chase Bank, N.A..

39.    The Trust I TruPS mature on March 15, 2035, but may be redeemed at HoldCo's option beginning on March 15, 2010.  The Trust I TruPS require quarterly distributions by Trust I.  HoldCo guaranteed payment on the Trust I TruPS pursuant to that certain Guarantee Agreement, dated December 21, 2004.

40.    Interest payments may be deferred by HoldCo for up to 20 consecutive quarterly periods.  In February 2012, HoldCo exercised its option to defer interest payments on the Trust I TruPS, and such deferral has continued through the Petition Date.

41.    As of September 30, 2015, the aggregate amount of principal and interest outstanding under the 2004 Securities was $35,783,100.87.

42.    <u>Junior Subordinated Debt Securities due June 15, 2035</u>.  On May 26, 2005, Trust II issued $25 million of trust preferred securities (the "<u>Trust II TruPS</u>") in a private placement

pursuant to that certain Capital Securities Purchase Agreement, dated May 26, 2005, between Trust II, HoldCo, and Merrill Lynch International.

43.     Trust II used the proceeds from the sale of the Trust II TruPS, together with HoldCo's initial capital contribution to Trust II of $774,000 that was made in exchange for 774,000 common securities issued to HoldCo by Trust II, to purchase approximately $25.8 million of HoldCo's junior subordinated debt securities (the "2005 Securities"), which were issued pursuant to that certain Indenture, dated June 1, 2005, between HoldCo and The Bank of New York Mellon Trust Company, National Association, as successor trustee to JPMorgan Chase Bank, National Association.

44.      The Trust II TruPS mature on June 15, 2035, but may be redeemed at HoldCo's option beginning on June 15, 2010.  The Trust II TruPS require quarterly distributions by Trust II.  HoldCo guaranteed payment on the Trust II TruPS pursuant to that certain Guarantee Agreement, dated June 1, 2005.

45.     Interest payments may be deferred by HoldCo for up to 20 consecutive quarterly periods.  In February 2012, HoldCo exercised its option to defer interest payments on the Trust II TruPS, and such deferral has continued through the Petition Date.

46.     As of September 30, 2015, the aggregate amount of principal and interest outstanding under the 2005 Securities was $29,764,598.86.

47.     Floating Rate Subordinated Notes.  ALLC is party to that certain Indenture, dated March 29, 2005, between ALLC and The Bank of New York Mellon Trust Company, National Association, as successor trustee to JP Morgan Chase Bank, National Association, pursuant to which ALLC issued Floating Rate Subordinated Notes due 2035 in the aggregate principal amount of $20 million (the "Subordinated Debt").

48.    On September 30, 2013, in connection with HoldCo's sale of its retail distribution business, HoldCo executed that certain Supplemental Indenture, dated September 30, 2013, between HoldCo and The Bank of New York Mellon Trust Company, National Association, as successor trustee to JPMorgan Chase Bank, National Association, pursuant to which HoldCo assumed all of ALLC's obligations under the Subordinated Debt.

49.    A payment of approximately $300,000.00 is due on October 15, 2015 under the Subordinated Debt.

50.    As of September 30, 2015, the aggregate amount of principal and interest outstanding under the Subordinated Debt was $20,357,915.00.

## IV.    The MGA Sale

51.    In the third and fourth quarters of 2014, the Regulated Entities booked substantial adverse development for losses and loss reserves, which resulted in an operating loss of $31 million for the year ended December 31, 2014.  This adverse development created severe capital and liquidity issues within the Regulated Entities.

52.    On multiple occasions, the liquidity and capital structure difficulties experienced by the Regulated Entities in 2014 put HoldCo at risk of default under the First Lien Debt and Second Lien Debt, primarily with respect to the minimum risk-based capital ("RBC") covenants under the related credit agreements.

53.    In May 2014, HoldCo entered into those certain (i) Second Amendment to Credit Agreement, dated May 14, 2014, between HoldCo and Credit Suisse, and (ii) Second Amendment to Second Lien Credit Agreement, dated May 14, 2014, between HoldCo and JCF, which eliminated the RBC covenant for the First Lien Debt and Second Lien Debt, respectively, as of March 31, 2014.

54.    Six months later, HoldCo entered into those certain (i) Third Amendment and Waiver to Credit Agreement, dated November 14, 2014, between HoldCo and Credit Suisse, and (ii) Third Amendment and Waiver to Second Lien Credit Agreement, dated November 14, 2014, between HoldCo and JCF, pursuant to which Credit Suisse and JCF, respectively, waived compliance with the RBC covenant for the First Lien Debt and Second Lien Debt, respectively, as of September 30, 2014.

55.    Three months later, HoldCo entered into those certain (i) Fourth Amendment and Waiver to Credit Agreement, dated March 31, 2015, between HoldCo and Credit Suisse, and (ii) Fourth Amendment and Waiver to Second Lien Credit Agreement, dated March 31, 2015, between HoldCo and JCF, pursuant to which Credit Suisse and JCF, respectively, waived compliance with the RBC covenant for the First Lien Dent and Second Lien Debt, respectively, as of December 31, 2014 and March 31, 2015, and Credit Suisse agreed to postpone a required $3.5 million principal payment, due March 31, 2015, under the First Lien Debt, until June 30, 2015.

56.    Beginning in the fourth quarter of 2014, HoldCo began to explore strategic transaction alternatives to address its financial difficulties.  HoldCo's management identified its MGA operations as a potential opportunity to realize value from the organization in order to recapitalize the Regulated Entities and pay down debt.  At a quarterly meeting of its board of directors on December 4, 2014, HoldCo invited an investment banking firm with expertise in insurance company transactions to give a presentation regarding the current market for MGA operations acquisitions.  At that same meeting, HoldCo's board of directors authorized HoldCo's management to retain an investment banker to conduct a marketing and sale process for HoldCo's MGA operations.  During that meeting and in subsequent meetings of HoldCo's board

of directors, it was generally discussed that HoldCo needed to find a solution to its capital and

liquidity issues before mid-2015.

57.     In December 2014, HoldCo engaged Aon Benfield Securities Limited ("Aon") as

financial advisor in connection with a potential strategic transaction involving HoldCo's MGA

operations.  Aon was instructed to commence a marketing process to identify qualified targets to

consummate an acquisition of HoldCo's MGA operations.  Beginning in January 2015, Aon

contacted over 50 potential strategic and private equity targets to identify interested parties.

Approximately 30 of these targets executed non-disclosure agreements.

58.     Aon received initial indications of interest from seven parties, and management

presentation meetings were held with each of those parties.  Second round indications of interest

were then received from three of those seven parties, which were reviewed in detail by HoldCo's

board of directors at its March 26, 2015 meeting.

59.     Confie Seguros Holding II Co. ("Confie"), which was one of the Retail Purchasers,

submitted an offer to acquire the MGA operations.  Confie's valuation of HoldCo's MGA

operations was significantly better than the next highest valuation.  Based on the valuation and

other factors, HoldCo's board of directors authorized Aon and management to pursue negotiation

of a final term sheet to sell the MGA operations to Confie.

60.     On June 30, 2015, HoldCo completed its sale of its MGA operations pursuant to

that certain Stock and Asset Purchase Agreement (the "SAPA"), dated June 12, 2015, between

HoldCo, AUSI, AISI, AGAI, AMSI, ASI, and Confie, for an aggregate purchase price of up to

$95 million, including certain contingent and non-contingent deferred payments, and subject to a

post-closing purchase price adjustment.  The purchase price was comprised as follows:

- $5 million in cash that was received when the SAPA was executed (the "Signing Retail Purchase Payment");

- $65 million in cash proceeds upon closing of the MGA Sale (the "Cash Proceeds");

- $10 million deferred cash payment contingent upon the achievement of certain conditions in 2017 and 2018 (the "Contingent Capacity Amount"); and

- $15 million deferred cash payment payable either to AIC to the extent necessary to maintain minimum quarterly RBC ratios, or to HoldCo on December 31, 2017 (the "Deferred RBC Amount").

61.     The Cash Proceeds were used, in part, to fully satisfy the First Lien Debt, and to partially satisfy the Second Lien Debt.

62.     Additionally, $20 million of the Cash Proceeds were used to infuse additional capital into AIC.

63.     The Deferred RBC Amount was secured by a letter of credit (the "LOC") provided by Confie and held in escrow by UMB Bank, n.a. (the "Escrow Agent").

64.     In addition to the SAPA, HoldCo and JCF executed that certain Consent and Waiver to Second Lien Credit Agreement (the "Waiver"), dated June 30, 2015, pursuant to which HoldCo agreed to (i) transfer the Signing Retail Purchase Payment to a newly-opened HoldCo deposit account ("Account #1"), and (ii) pay or cause to be paid (X) the balance of the Estimated Cash Payment (as defined in the SAPA); and (Y) immediately upon receipt thereof by HoldCo or any of its non-regulated subsidiaries, unless such amount is applied to repay the outstanding principal amount of the Second Lien Debt, 100% of any cash deferred consideration or released escrow amounts pursuant to the SAPA, to Account #1.  Account #1 is subject to a Deposit Account Control Agreement, dated July 15, 2015, between UMB Bank, n.a. ("UMB"), HoldCo, and JCF, as the secured party.

65.     Also pursuant to the Waiver, HoldCo agreed that within five days after the closing of the MGA Sale, it would withdraw from Account #1 an amount equal to $8,572,000 and

deposit such amounts into a second newly-opened HoldCo deposit account ("Account #2"). Account #2 is subject to a Deposit Account Control Agreement, dated July 24, 2015, between UMB, HoldCo, and JCF, as the secured party (the "Account #2 DACA").

66.    Pursuant to the Waiver, any amounts remaining in Account #1 or Account #2 on September 30, 2017 shall be withdrawn and applied to repay the Second Lien Debt.  On or around five days after the closing of the MGA Sale, HoldCo withdrew from Account #1 an amount equal to $8,572,000 and deposited such amount into Account #2.

67.    JCF delivered a notice to UMB on September 1, 2015 pursuant to the Account #2 DACA, instructing UMB to not permit any access to or disposition over Account #2 by, and not to honor or follow any instruction with regard to Account #2 from, any person (including HoldCo) other than JCF.

**V.    Events Leading to These Chapter 11 Cases**

68.    The NSPAI business is highly competitive and, except for regulatory considerations, there are relatively few barriers to entry.  Affirmative competes based on factors including price, coverages offered, availability of flexible down payment arrangements and billing plans, customer service, claims handling, and agent commission.

69.    Affirmative competes with other companies that sell NSPAI policies through independent agencies as well as with insurance companies that sell such policies directly to their customers.  The independent agencies that sell Affirmative's insurance products compete both with these direct writers and with other independent agencies.  Thus, Affirmative's competitors are not only large national insurance companies, but also smaller regional insurance companies and independent agencies that operate in a specific region or single state in which Affirmative

operates.  As of December 31, 2014, the top ten NSPAI companies accounted for 74.1% of direct premiums earned in the $25.1 billion market segment.

70.    The NSPAI industry historically has been cyclical in nature, characterized by periods of severe price competition and excess underwriting capacity followed by periods of high premium rates and shortages of underwriting capacity.

71.    Affirmative has incurred losses from operations over the six years ended December 31, 2014, including an operating loss of $31 million for the year ended December 31, 2014.  Losses over this period of time were primarily due to underwriting losses, significant revenue declines, expenses declining less than the amount of revenue declines, and goodwill impairments.  The losses from operations were the result of significant new business written in 2012 and 2013, prior pricing issues in some states in which Affirmative has taken significant pricing and underwriting actions to address profitability, losses from states that Affirmative has exited, including Florida and Michigan, and goodwill impairment charges as a result of such losses.

72.    Affirmative's losses from operations have continued during 2015, notwithstanding the actions taken to address the liquidity and capital issues in the Regulated Entities.  For the quarter ended June 30, 2015, AIC took adverse development for losses and loss reserves in an approximate amount of $35 million, which left AIC with approximately $2.49 million in surplus and an RBC ratio far less than the required regulatory minimum.

73.    <u>Illinois Rehabilitation</u>.  On September 16, 2015, AIC was placed in rehabilitation under the control and authority of the Illinois Director of Insurance (the "<u>Illinois Rehabilitation</u>").  The Illinois Rehabilitation is pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division (the "<u>Illinois Court</u>") as Case No. 15 CH 13718.

74.     On September 24, 2015, the Illinois Court entered an order approving that certain Settlement Agreement and Release, dated September 24, 2015, between Confie Seguros Holding II Co. and its affiliates and AIC (the "AIC Settlement Agreement").

75.     Affirmative is not a party to the AIC Settlement Agreement and was not apprised of the negotiations related thereto.

76.     Under the AIC Settlement Agreement, Confie agreed to pay to AIC $15 million in exchange for a non-interest bearing surplus note (the "Surplus Note") issued by AIC.  The Rehabilitator (as defined in the AIC Settlement Agreement) agreed to work with Confie to secure the release of the $15 million LOC that was deposited with the Escrow Agent in connection with the Deferred RBC Amount (as discussed above in Section III).

77.     On September 29, 2015, Confie notified Affirmative that it had paid $15 million to AIC, and contemporaneously demanded that the Escrow Agent cancel the LOC.

78.     Upon information and belief, Confie would have likely been obligated under the SAPA to pay the Deferred RBC Amount to the Rehabilitator (without a corresponding Surplus Note) on or around November 2015 (when RBC ratios are calculated).

79.     Under the AIC Settlement Agreement, Confie, and AIC provided broad, mutual releases to each other.

80.     The Debtors are investigating certain causes of action that may be brought by the Debtors in connection with the Surplus Note.

81.     HoldCo received a letter, dated October 9, 2015, from the Rehabilitator demanding payment of certain amounts (the "AIC Tax Credit Liability"), on or before October 11, 2015, owed by HoldCo to certain of the Regulated Entities pursuant to that certain Consolidated Tax Allocation Agreement, dated January 1, 2004, between HoldCo and certain of its subsidiaries

(the "Allocation Agreement").  The Debtors dispute that the AIC Tax Credit Liability was due on

that date.  Pursuant to section 4(a) of the Allocation Agreement, the AIC Tax Credit Liability is

payable 30 days after the "due date" of HoldCo's Consolidated Federal Income Tax Return.  The

due date for HoldCo's 2015 Consolidated Federal Income Tax Return was September 15, 2015.

Therefore, the AIC Tax Credit Liability is due on October 15, 2015.

82.    HoldCo also received a letter, dated October 9, 2015, from JCF declaring an Event

of Default under the Second Lien Debt on account of the commencement of the Illinois

Rehabilitation, and accelerating the Second Lien Debt.

83.    Louisiana Rehabilitation. On September 17, 2015, Affirmative Casualty Insurance

Company and Affirmative Direct Insurance Company were placed in rehabilitation under the

control and authority of the Commissioner of the Louisiana Department of Insurance (the

"Louisiana Rehabilitation").  The Louisiana Rehabilitation is pending in the Nineteenth Judicial

District Court, the Parish of East Baton Rouge, State of Louisiana as Case No. 642353.

84.    Michigan Rehabilitation. The Debtors are currently in negotiations with the

relevant insurance regulatory authorities in Michigan regarding the commencement of a

rehabilitation proceeding for Affirmative Insurance Company of Michigan.  As of the Petition

Date, no such proceeding has been commenced.

## FACTS RELEVANT TO FIRST DAY PLEADINGS[10]

85.    Together with the filing of these Chapter 11 Cases, the Debtors filed certain First

Day Pleadings that request various types of relief.  Generally, the First Day Pleadings have been

designed to ensure the continuation of the Debtors' cash management systems and other business

---

[10] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the relevant First Day
Pleadings.

operations without interruption, and establish certain other administrative procedures to promote a smooth transition into these Chapter 11 Cases.

86.    I have reviewed each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto) and, to the best of my knowledge, information and belief, the facts recited therein with respect to the Debtors are true and correct and are hereby incorporated by reference.  I believe that the relief sought in each First Day Pleading is essential to the Debtors' ability to achieve a successful reorganization.

      i.    *Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* (the "<u>Joint Administration Motion</u>")

87.    In the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only.  Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will affect most, if not all, of the Debtors jointly.

88.    The Debtors further seek entry of an order directing the Clerk of the Court to maintain one file and one docket for all of these Chapter 11 Cases under the case of Affirmative Insurance Holdings, Inc.

89.    Joint administration of these Chapter 11 Cases will ease the administrative burden on this Court and all parties in interest, and will not prejudice creditors or other parties in interest because joint administration is purely procedural and will not impact the parties' substantive rights.

90.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

ii.    *Debtors' Motion for Order (I) Authorizing the Debtors to Prepare a Consolidated List of the Debtors' Top Thirty Unsecured Creditors; (II) Implementing Certain Email Notice Procedures; and (III) Approving the Form and Manner of the Notice of Commencement (the "*Consolidated Creditors Motion*")*

91.    In the Consolidated Creditors Motion, the Debtors seek an order (i) authorizing the Debtors to prepare a consolidated list of the Debtors' thirty largest unsecured creditors, (ii) implementing certain email notice procedures, and (iii) approving the form and manner of notice of the commencement of these Chapter 11 Cases.

92.    A single consolidated list of the Debtors combined thirty largest unsecured creditors in these Chapter 11 Cases would better reflect the body of unsecured creditors with the greatest stake in these Chapter 11 Cases than separate Top 30 Lists for each of the Debtors.  The Debtors believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these Chapter 11 Cases.

93.    Because of the scope of the Debtors' operations, the costs of providing traditional notice (i.e., mailing printed copies of pleadings via first class mail) will be unnecessarily burdensome and costly to the Debtors' estates.  The Notice Procedures, which provide, in part, that parties shall be deemed to have consented to electronic service of papers unless a party files a request to be exempted from electronic service, will help alleviate this burden and conserve the limited resources available in these Chapter 11 Cases.

94.    The Debtors request that the Noticing Agent, and not the Clerk, be directed to serve the Commencement Notice by regular mail, postage prepaid, on those entities entitled to receive such notice pursuant to Bankruptcy Rule 2002(a) no later than five business days after the Debtors receive notice of the time and place of the Section 341 Meeting.

95.    I believe that the relief requested in the Consolidated Creditors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

     *iii.*     *Debtors' Motion for Authorization to Continue Using Existing Bank Accounts, Business Forms, and Cash Management System* (the "Cash Management Motion")

96.     The Debtors use a centralized cash management system to collect funds from and for, and to pay expenses incurred by, their operations (the "Cash Management System"). The Cash Management System includes thirteen active Debtor bank accounts, a list of which is attached as Exhibit B to the Cash Management Motion (the "Bank Accounts"). The Debtors' Bank Accounts are held at Capital One, UMB Bank, n.a., Frost Bank, and UBS (collectively, the "Banks"). The Debtors maintain current and accurate accounting of all of the Debtors' transactions through the Cash Management System. The Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

97.     The Cash Management System is integral to the operation and administration of the Debtors' business. In this regard, the Cash Management System allows the Debtors to efficiently (a) collect outstanding receivables, (b) identify the Debtors' cash requirements, and (c) transfer cash as needed to respond to these requirements.

98.     To minimize expenses to their estates, the Debtors also request authorization to continue using correspondence and business forms (including, but not limited to, letterheads, purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock (collectively, the "Business Forms")) without reference to the Debtors' status as debtors in possession. The Debtors anticipate that these Chapter 11 Cases will proceed to a quick conclusion, at which point Business Forms with "DIP" imprinted on them would need to be

discarded.  Accordingly, adding the required legend would have little practical effect and is inappropriate under the circumstances.

99.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

    *iv.* *Debtors' Motion for Authority to Pay Prepetition Employee Wages, Benefits, and Related Items* (the "Wage Motion")

100.    To minimize the personal hardships the Debtors' employees will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain morale during this critical time, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay: (a) prepetition wages, salaries, overtime pay, sick pay, vacation pay and other accrued compensation; (b) unreimbursed or unpaid prepetition business expenses; (c) deductions taken from employees' paychecks (i) to make payments on behalf of the employees for or with respect to, among other things, the Debtors' employee benefit programs, loan repayments and garnishments or amounts due third parties and (ii) on account of various federal, state or local income, FICA, Medicare, state disability, workers' compensation and other taxes for remittance to the appropriate federal, state or local taxing authority; (d) prepetition contributions to, and benefits under, employee benefit programs; and (e) all costs and expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers.  The Debtors also seek authority for the Debtors' banks and other financial institutions to process and honor checks and transfers related to the foregoing obligations

101.    It is essential that the Debtors pay prepetition employment-related obligations to ensure the continued operation of the Debtors' business, maintain the morale of the Debtors'

employees, and preserve the Debtors' ability to reorganize.  Absent the requested relief, many

employees may be unable to meet personal obligations, may be left without medical insurance,

or may seek alternative employment opportunities, perhaps with the Debtors' competitors.

> v.    *Debtors' Motion for Interim and Final Orders (A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Assurance* (the "Utilities Motion")

102.   In the Utilities Motion, the Debtors seek entry of the Interim Order and Final Order

(a) prohibiting providers of electric, gas, and water services to the Debtors (collectively, the

"Utility Companies") from discontinuing, altering, or refusing service to the Debtors, except as

set forth therein; (b) determining that the Utility Companies have been provided with adequate

assurance of payment on the basis of the establishment of the Utility Deposits; and (c) approving

the Debtors' proposed procedures for Utility Companies to request additional assurance of

payment.

103.   To provide adequate assurance of payment for future services to the Utility

Companies, the Debtors propose to provide a deposit to each of the Utility Companies equal to

approximately 50% of the Debtors' estimated monthly utility spend attributable to such Utility

Company (collectively, the "Utility Deposits").  To the extent that any Utility Company or

Added Utility Company holds a Security Deposit that exceeds the prepetition amount owed to

such Utility Company or Added Utility Company, the excess amount of such Security Deposit

will be applied toward the Utility Deposit.

104.   In addition, the Debtors seek to establish reasonable procedures (the "Adequate

Assurance Procedures") by which a Utility Company may request additional assurance of future

payment if such Utility Company believes that the Utility Deposit, or its Security Deposit, does not provide it with satisfactory adequate assurances.

105.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary to continue the Debtors' normal business operations and to preserve the Debtors' ability to restructure its business in an orderly manner.

      *vi.*    *Debtors' Motion for Entry of Interim and Final Orders Establishing Notice and Objection Procedures for Transfers of Equity Securities, (II) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims  Against the Debtors' Estates, and (III) Granting Related Relief* (the "NOL Motion")

106.    As a result of past losses from the operation of their businesses, the Debtors estimate that their available federal income tax net operating losses, as of the Petition Date, are approximately $80 million (the "NOLs"), which amounts could be even higher when the Debtors emerge from chapter 11.  These NOLs are valuable tax attributes, and to preserve the NOLs the Debtors are seeking entry of interim and final orders (a) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities in Affirmative Insurance Holdings, Inc., (b) establishing a record date for notice and potential sell-down procedures for trading in claims against the Debtors, and (c) granting related relief.

107.    The relief sought will enable the Debtors to closely monitor certain transfers of equity securities, and thereby preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize the Debtors' use of their NOLs. In addition, establishing a record date with respect to trading in claims against the Debtors will ensure that claimholders receive sufficient notice that any claims purchased after such date may ultimately be subject to certain sell-down procedures in the event an order approving such

procedures is sought by the Debtors and entered by the Court in order to preserve the Debtors'

ability to use their NOLs.

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, that the foregoing is true and correct to the best of my knowledge, information, and belief.  Accordingly, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just.

Dated: October 14, 2015

By:    _____
       Michael J. McClure
       Chief Executive Officer
       Affirmative Insurance Holdings, Inc.