## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AFFIRMATIVE INSURANCE HOLDINGS, INC., *et al.*,[1] | ) ) | Case No. 15-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR TRANSFERS OF EQUITY SECURITIES, (II) ESTABLISHING A RECORD DATE FOR NOTICE AND SELL-DOWN PROCEDURES FOR TRADING IN CLAIMS AGAINST THE DEBTORS' ESTATES, AND (III) GRANTING RELATED RELIEF

Affirmative Insurance Holdings, Inc. ("HoldCo") and certain of its wholly-owned direct

and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (these "Chapter 11 Cases"), hereby submit this motion (the

"Motion") for entry of interim and final orders (the "Interim Order" and "Final Order,"

respectively), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**,

(i) establishing notice and objection procedures for transfers of equity securities, (ii) establishing

a record date for notice and sell-down procedures for trading in claims against the Debtors'

estates, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state

as follows:[2]

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Affirmative Insurance Holdings, Inc. (0432); Affirmative Management Services, Inc. (7252); Affirmative Services, Inc. (7255); Affirmative Underwriting Services, Inc. (7250); Affirmative Insurance Services, Inc. (8823); Affirmative General Agency, Inc. (2345); Affirmative Insurance Group, Inc. (7246); and Affirmative, L.L.C. (2347).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 150 Harvester Drive, Suite 250, Burr Ridge, Illinois 60527.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Michael J. McClure in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

**<u>Jurisdiction</u>**

1.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory bases for the relief requested herein are sections 105(a), 362, and 541 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 3001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

4.       Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

**<u>Background</u>**

5.       On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.       The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.       No trustee, examiner, creditors' committee, or other official committee has been appointed in these Chapter 11 Cases.

8.       A description of the Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases is set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference.

- 2 -

## Relief Requested

9.       By this Motion, the Debtors seek entry of interim and final orders (a) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities in HoldCo, (b) establishing a record date (the "Record Date") for notice and potential sell-down procedures for trading in claims against the Debtors ("Claims"), and (c) granting related relief.  The relief requested in this Motion is necessary to protect the potential value of the Debtors' net operating losses ("NOLs").

10.       HoldCo's common stock was traded on the NASDAQ Global Select Market until it was delisted in 2012.  Since the delisting, HoldCo's common stock has been traded exclusively in the over-the-counter market.  HoldCo has 75,000,000 shares of authorized common stock, of which 18,802,220 are issued and 16,008,357 are outstanding ("Equity Securities").  HoldCo's market capitalization as of the Petition Date was approximately $600,000.  In addition to having publicly-traded equity, as of the Petition Date, the Debtors have approximately $15 million outstanding in second lien debt, $65 million outstanding in junior subordinated debt securities, and approximately $20 million outstanding in floating rate subordinated notes.

11.       The Debtors have experienced years of losses from the operation of their business.  As a result, the Debtors estimate that their federal income tax NOLs are approximately $80 million as of the Petition Date, which amounts could be even higher when the Debtors emerge from chapter 11.[3]  These NOLs could translate into future reductions of the Debtors' federal income tax liabilities of approximately $28 million based on a corporate federal income tax rate of 35%.  These tax savings could substantially enhance the Debtors' cash position for the benefit of parties in interest and contribute to the Debtors' efforts in these Chapter 11 Cases.

---

[3] The Debtors' NOLs consist of losses generated in individual tax years, each of which can be "carried forward" for up to 20 subsequent tax years to offset the Debtors' future taxable income, thereby reducing future aggregate tax obligations.  See 26 U.S.C. § 172.

- 3 -

12.     As described more fully below, the Debtors may lose the ability to use their NOLs if they experience an "ownership change" for federal income tax purposes.  To prevent this potential loss of property of the Debtors' estates, the Debtors request Court approval of the procedures detailed herein to govern the transfers of Equity Securities during the pendency of these Chapter 11 Cases.  In addition, the Debtors may ultimately need to seek an order (a "Sell-Down Order") in connection with a plan of reorganization with respect to trading in Claims to protect and preserve the value of the NOLs, and this Motion is designed to give advance notice of such possibility.

## A.     Potential Limitations on the Use of the Debtors' NOLs

13.     Section 172 of the Internal Revenue Code of 1986 (as amended, the "IRC") permits corporate taxpayers to use NOLs in years following the years in which they were incurred, including years after they have experienced an ownership change.  However, section 382 of the IRC limits the income against which the NOLs can be deducted after an ownership change.

### i.      Ownership Change Outside the Context of a Chapter 11 Plan

14.     The Debtors' ability to use their NOLs is subject to certain statutory limitations. Section 382 of the IRC limits the ability of a corporation to use its NOLs if an "ownership change" occurs.  Generally, an "ownership change" occurs if the percentage (by value) of the stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the relevant testing period, which is usually three years.[4]  For example, an ownership change would occur in the following situation:

---

[4] In general, under section 382(g)(4)(A) of the IRC, all shareholders who individually hold less than 5% of the stock of a company are deemed to be a single 5% shareholder throughout the three-year testing period, and transfers

51501844.1

Three individuals ("A," "B" and "C") each own 20% of the stock of corporation X ("X"). Each sells 15% to another individual ("D"), who has recently acquired 7%. Under section 382 of the IRC, an ownership change has occurred because D both became a 5% shareholder and increased his ownership in X by more than 50 percentage points (from 0% to 52%) during the testing period.

15.     When an ownership change occurs, section 382 of the IRC limits the amount of future taxable income that the company can offset by its "pre-change losses" in any taxable year (or a portion thereof) to an annual amount equal to (a) the value of its stock prior to the ownership change, multiplied by (b) the long-term, tax-exempt interest rate. See IRC § 382(b). For distressed companies in particular, this limitation could severely restrict the use of NOLs because the value of their stock may be quite low. For example, if a hypothetical company were to become distressed, such that its equity value was $2 million, and undergo an ownership change when its equity value was at this depressed level, the annual limitation on the company's use of its NOLs resulting from that ownership change would be $56,400 (based on a 2.82% long-term, tax-exempt rate that would apply under section 382 of the IRC for an ownership change occurring in September 2015). In other words, the company would be able to utilize only $56,400 of its NOLs in each post-change tax year because the ownership change occurred when the company's stock value was low. Taxable income in excess of this amount would be taxable to the company at the federal rate of 35%.

16.     Thus, if left unrestricted, transfers of Equity Securities could severely limit the Debtors' ability to use their NOLs, and could have significant negative consequences for the Debtors, their estates, and their efforts in these Chapter 11 Cases. Specifically, transfers of Equity Securities could adversely affect the Debtors' NOLs if (a) too many 5% or greater blocks

---

between such shareholders are disregarded for purposes of determining whether an ownership change has occurred. Accordingly, the Debtors do not seek to impose the requested notice and objection procedures on transfers among shareholders holding less than 4.5% of HoldCo' stock, provided that such shareholders do not have an intent to accumulate a 5% or greater block of stock or add or sell shares to or from such block.

of Equity Securities are created, or (b) too many Equity Securities are added to or sold from such blocks, such that, together with previous transfers by or to 5% shareholders during the preceding three year period, an ownership change within the meaning of section 382 of the IRC has occurred.

### ii.    Ownership Change in the Context of a Confirmed Chapter 11 Plan

17.    The limitations imposed by section 382 of the IRC are significantly relaxed if an ownership change occurs pursuant to a confirmed chapter 11 plan. Under section 382(l)(5) of the IRC, a corporation is not subject to the limitations imposed by section 382 of the IRC if (a) the ownership change resulted from consummation of a chapter 11 plan and (b) under the plan, the debtor's pre-change-in-ownership shareholders (i.e., persons or entities who owned the debtor's stock immediately before the relevant ownership change) and/or "Qualified Creditors" emerge from the reorganization owning at least 50% of the total value and voting power of the debtor's stock immediately after the ownership change (the "Section 382(l)(5) Safe Harbor").

18.    Under section 382(1)(5)(E) of the IRC and the regulations promulgated thereunder, a creditor whose claim is exchanged for stock of the debtor under a plan of reorganization or pursuant to an applicable bankruptcy court order is a "Qualified Creditor" for section 382 purposes if such claim either (a) has been owned by such creditor for 18 or more months prior to the date of filing of the bankruptcy petition, or (b) arose in the ordinary course of the debtor's business and was at all times beneficially owned by such creditor. Creditors may also be "qualified," despite not satisfying the continuous ownership requirements under either (a) or (b) of the preceding sentence, if they meet the criteria set forth in the De Minimis Rule (as defined below).

- 6 -

19.     For purposes of the Section 382(1)(5) Safe Harbor, under Treasury Regulation § 1.382-9(d)(3) (the "De Minimis Rule"), a debtor generally may "treat indebtedness as always having been owned by the beneficial owner of the indebtedness immediately before the ownership change if the beneficial owner is not, immediately after the ownership change, either a 5-percent shareholder or an entity through which a 5-percent shareholder owns an indirect ownership interest" in the debtor.  Such a claimholder will generally be a Qualified Creditor under the Section 382(1)(5) Safe Harbor unless the particular claim(s) that it holds both (a) did not arise in the ordinary course of the issuing debtor's business and (b) was not in existence 18 months prior to the filing of the bankruptcy petition.

20.     Alternatively, where an ownership change results from consummation of a chapter 11 plan but the requirements for the Section 382(l)(5) Safe Harbor are *not* met, section 382(b) of the IRC would limit the amount of taxable income that the debtor could offset with NOLs.

21.     Under the scenario where the requirements for the Section 382(l)(5) Safe Harbor are not met, the section 382 limitation is calculated using the special rule of section 382(l)(6) of the IRC.  That rule provides that the value of the debtor, for purposes of calculating the section 382 limitation, generally must reflect any increase in value resulting from any surrender or cancellation of creditors' claims, as well as any new investments, pursuant to the plan.  As a result, assuming the debtor's value increases as a result of its reorganization, the amount of taxable income that can be offset will still be limited—although not by as much as if the ownership change occurred outside the context of a confirmed chapter 11 plan.

22.     Therefore, to protect the Debtors' ability to maximize the use of their NOLs, the Debtors may need to seek entry of a Sell-Down Order allowing them to (a) determine whether

the reorganized Debtors will qualify for and benefit from the Section 382(l)(5) Safe Harbor, and (b) require certain persons or entities that have acquired Claims during these Chapter 11 Cases in an amount that would entitle such claimholders to receive more than 4.5% of the equity of the reorganized Debtors (collectively, the "Substantial Claimholders") to sell down their claims to the extent necessary to allow the reorganized Debtors to qualify for the Section 382(l)(5) Safe Harbor (the "Sell-Down Procedures").[5]

## B.    The Proposed Equity Transfer Procedures

23.    By establishing procedures for monitoring the transfer of Equity Securities, the Debtors can preserve their ability to seek the necessary relief at the appropriate time if it appears that transfers of Equity Securities may jeopardize the Debtors' use of their NOLs.  Therefore, the Debtors propose the following notice and objection procedures for holding and transferring Equity Securities (the "Equity Transfer Procedures"):

(1)    Certain Defined Terms.  For purposes of this Motion, the Interim Order, and the Final Order (A) a "Substantial Equityholder" is any person or entity that beneficially owns at least 720,376 Equity Securities (representing approximately 4.5% of the 16,008,357 issued and outstanding Equity Securities);[6] (B) "beneficial ownership" of Equity Securities shall be determined in accordance with applicable rules under section 382 of the IRC and the regulations promulgated thereunder and shall include (i) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all shares owned or acquired by its subsidiaries), (ii) ownership by such holder's family members and persons acting in concert with such holder to make a coordinated acquisition of stock and ownership of options to acquire stock; (C) an "option" to acquire stock includes any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable; and (D) a "Transfer" means any transfer of Equity Securities to the extent described in paragraph 23(3) below (Stock Acquisition Notice) and/or paragraph 23(4) below (Stock Disposition Notice).

---

[5] A summary of the potential Sell-Down Procedures is provided in section C below.

[6] To allow for a prudent margin of error and in a good faith effort to avoid underestimating the threshold, the Debtors have calculated the threshold using 4.5% instead of 5%.

(2)     Notice of Substantial Equityholder Status.  Any person or entity who currently is or becomes a Substantial Equityholder shall (a) file with the Court and (b) serve upon (i) the Debtors, c/o Affirmative Insurance Holdings, Inc., 150 Harvester Drive, Suite 250, Burr Ridge, Illinois 60527 (Attn: General Counsel), and (ii) McDermott Will & Emery LLP, 340 Madison Avenue, New York, New York 10173 (Attn: Darren Azman), a notice of such status, in the form attached as Exhibit 2 to the Interim Order (a "Notice of Substantial Equityholder Status"), on or before the later of (A) 14 days after entry of the Interim Order or (B) 14 days after becoming a Substantial Equityholder.

(3)     Stock Acquisition Notice.  At least 28 days prior to any transfer of Equity Securities that would result in an increase in the amount of Equity Securities beneficially owned by a Substantial Equityholder or would result in a person or entity becoming a Substantial Equityholder, such Substantial Equityholder or potential Substantial Equityholder shall (a) file with the Court and (b) serve on the Debtors and counsel to the Debtors (at the addresses set forth in paragraph 23(2) above), advance written notice of the intended transfer of Equity Securities, in the form attached as Exhibit 3 to the Interim Order (a "Stock Acquisition Notice").

(4)     Stock Disposition Notice.  At least 28 days prior to any transfer of Equity Securities that would result in a decrease in the amount of Equity Securities beneficially owned by a Substantial Equityholder or would result in a person or entity ceasing to be a Substantial Equityholder, such Substantial Equityholder shall (a) file with the Court and (b) serve on the Debtors and counsel to the Debtors (at the addresses set forth in paragraph 23(2) above), advance written notice of the intended transfer of Equity Securities, in the form attached as Exhibit 4 to the Interim Order (a "Stock Disposition Notice").

(5)     Objection Procedures.  The Debtors shall have 21 days after receipt of a Stock Acquisition Notice or a Stock Disposition Notice (each, a "Transfer Notice") to file with the Court and serve on the party filing the Transfer Notice an objection to the proposed Transfer on the grounds that such Transfer may adversely affect the Debtors' ability to utilize their NOLs.  If the Debtors file an objection, the proposed Transfer will not be effective unless and until approved by a final and nonappealable order of this Court.  If the Debtors do not object within such 21-day period, the Transfer may proceed solely as set forth in the Transfer Notice. Further Transfers within the scope of this paragraph must comply with the Equity Transfer Procedures set forth in this paragraph 23.

(6)     Unauthorized Transfers of Equity Securities.  Effective as of the Petition Date and until further order of this Court to the contrary, any acquisition or disposition of Equity Securities in violation of the Equity Transfer Procedures shall be null and void ab initio as an act in violation of the automatic stay under Bankruptcy Code section 362.

24.    With respect to the Equity Transfer Procedures, the Debtors may waive, in writing, in their sole and absolute discretion, any and all restrictions, stays and notification procedures contained in this Motion or in any order entered with respect hereto.

25.    After entry of the Interim Order, the Debtors propose to provide a notice in substantially the form attached as <u>Exhibit 1</u> to the Interim Order (the "<u>Equity Transfer Procedures Notice</u>") to (a) the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), (b) the United States Securities and Exchange Commission, (c) the Internal Revenue Service, and (d) any registered holders of the Equity Securities, describing the authorized transfer restrictions and notification requirements with respect to Equity Securities, and notifying parties of the Record Date (which shall be the date on which the Interim Order is entered).

26.    Upon receipt of such Equity Transfer Procedures Notice, any broker, bank, dealer, or other agent or nominee of a beneficial holder of Equity Securities (each a "<u>Nominee</u>") will be required, within five (5) business days after receipt of such notice and on at least a quarterly basis thereafter, to send the Equity Transfer Procedures Notice to all beneficial holders of Equity Securities on whose behalf such Nominee holds Equity Securities.  To the extent such beneficial holder is also a Nominee, such Nominee must, in turn, promptly provide the Equity Transfer Procedures Notice to any holder for whose account such holder holds Equity Securities, and so on down the chain of ownership.  Additionally, any person, entity, broker or agent acting on behalf of any holder of Equity Securities who sells at least 720,376 Equity Securities (representing approximately 4.5% of the 16,008,357 issued and outstanding Equity Securities) to another person or entity must provide a copy of the Equity Transfer Procedures Notice to such purchaser or any broker or agent acting on such purchaser's behalf.

27.     The Equity Transfer Procedures Notice will provide the date and time (the "Objection Deadline") by which parties must file an objection to the Motion ("Objection").  If an Objection is timely filed and served, a final hearing will be held at the date and time set forth in the Interim Order (the "Final Hearing").  If no Objection is timely filed and served, the Interim Order will be deemed a final order without further notice or hearing upon expiration of the Objection Deadline.  If a Final Hearing is necessary, the Debtors will submit to the Court a final order substantially in the form attached as **Exhibit B** to the Motion.

C.     **Record Date Notice and Summary of Potential Sell-Down Procedures**

28.     At this stage, it is too early to determine whether it will be necessary for the Debtors to obtain a Sell-Down Order.  The Debtors' determination of whether to seek entry of a Sell-Down Order will most likely occur after they have formulated a plan of reorganization and have determined whether they may qualify for and benefit from the Section 382(l)(5) Safe Harbor, such that it is necessary to require Substantial Claimholders to comply with the Sell-Down Procedures summarized below.  Accordingly, this Motion does not seek entry of a Sell-Down Order, but seeks to establish the Record Date through entry of the Interim and Final Orders.  The Debtors propose to set the Record Date as the date of entry of the Interim Order.

29.     After entry of the Interim Order, the Debtors propose to provide a notice of the Record Date in substantially the form attached as Exhibit 5 to the Interim Order (the "Record Date Notice") to (a) the U.S. Trustee, (b) The Bank of New York Mellon Trust Company, National Association, solely in its capacities as the trustee for the Debtors' Junior Subordinated Debt Securities due March 15, 2035, Junior Subordinated Debt Securities due June 15, 2035, and Floating Rate Subordinated Notes due March 15, 2035, (c) JCF AFFM Debt Holdings L.P., in its capacity as administrative agent and collateral agent, (d) the United States Securities and

Exchange Commission, (e) the Internal Revenue Service, and (f) those creditors holding the thirty largest unsecured claims against the Debtors' estates.

30.    Upon receipt of such Record Date Notice, any trustee for Claims will be required, within five (5) days of receipt of such notice and on at least a quarterly basis thereafter, to send the Record Date Notice to all holders of Claims registered with such trustee.  Any such registered holder, in turn, must promptly provide the Record Date Notice to any holder for whose account such registered holder holds Claims, and so on down the chain of ownership.

31.    Similar to the Equity Transfer Procedures Notice, the Record Date Notice will also provide the Objection Deadline for parties to file an Objection to the Motion, and explain that if no Objection is timely filed and served, the Interim Order shall be deemed a final order without further notice or hearing upon expiration of the Objection Deadline.  If an Objection is timely filed and served, a Final Hearing will be held and the Debtors will submit to the Court a final order substantially in the form attached as **Exhibit B** to the Motion.

32.    In the event the Debtors seek entry of a Sell-Down Order, the Debtors anticipate that the Sell-Down Procedures would require a person or entity that has acquired an amount of Claims after the Record Date entitling that claimholder to receive more than 4.5% of the equity of the reorganized Debtors (the "Threshold Amount") to provide the Debtors with limited information such as the size of its Claim and the date(s) on which such Claim was acquired.  The amount of Claims held by a claimholder as of the Record Date would constitute the "Protected Amount."  Substantial Claimholders would never be required to sell down their Claims below the Threshold Amount or the Protected Amount, whichever is greater.  In other words, the Sell-Down Order would apply only to persons or entities that acquire Claims in excess of the Threshold Amount after the Record Date and with full notice of the possibility that the Claims

they acquire could be subject to sell-down if the Debtors later determine that the Sell-Down Procedures are necessary.

33.    If the Sell-Down Procedures prove to be necessary, the Debtors would seek to require Substantial Claimholders to provide updated holdings information shortly after the date on which the Court approves a disclosure statement for a plan of reorganization that proposes to utilize the Section 382(l)(5) Safe Harbor.  Based on the updated holdings information, the Debtors would then determine whether it would be necessary to require Substantial Claimholders to sell down a portion of their holdings so that the Debtors may qualify for the Section 382(l)(5) Safe Harbor and to preserve the value of the Debtors' NOLs.

34.    In the event that the Debtors seek entry of a Sell-Down Order, the Debtors would provide adequate notice and opportunity for claimholders to sell down their Claims without triggering an unreasonable adverse impact on the value of such Claims.  Specifically, if a claimholder were required to sell down its holdings, the claimholder would have until shortly before the Debtors consummate a plan of reorganization to effectuate the necessary sell-down. Moreover, establishment of the Record Date at this early stage of these Chapter 11 Cases will provide claimholders with sufficient notice in advance of any trading opportunity that any Claims purchased after the Record Date may ultimately be subject to the Sell-Down Procedures as set forth in a Sell-Down Order.

**Basis for Requested Relief**

A.    **The NOLs Are Property of the Debtors' Estates and Are Entitled to Protection**

35.    Courts have uniformly held that a debtor's NOLs constitute property of the estate under Bankruptcy Code section 541 and, therefore, that courts have the authority to impose measures intended to protect and preserve such NOLs.  The seminal case articulating this rule is In re Prudential Lines, Inc., 107 B.R. 832 (Bankr. S.D.N.Y. 1989), aff'd, 119 B.R. 430 (S.D.N.Y.

1990), aff'd, 928 F.2d 565 (2d Cir. 1991); see also Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.), 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them."); In re Cumberland Farms, Inc., 162 B.R. 62, 67 (Bankr. D. Mass. 1993) (finding that the Second Circuit's Prudential Lines ruling on NOLs was analogous and persuasive in holding that pass-through losses were property of the estate and were protected by the automatic stay); In re Phar-Mor, Inc., 152 B.R. 924, 927 (Bankr. N.D. Ohio 1993) (carryforward NOLs held to be property of the estate and protected by both the automatic stay and an injunction against the sale of stock causing a reduction of the NOLs).

36.      In Prudential Lines, the court enjoined a parent corporation from taking a worthless stock deduction with respect to its wholly owned subsidiary, which was in bankruptcy, on the grounds that allowing the parent to take such a deduction would destroy its debtor subsidiary's NOLs.  In issuing the injunction, the court held that the debtor subsidiary's potential ability to utilize NOLs was property of its estate.  107 B.R. at 838.  Further, the court held that, because of the effect that it would have on the debtor subsidiary's ability to use its NOLs, the taking of a worthless stock deduction by the parent was an exercise of control over the debtor subsidiary's NOLs and thus over property of the debtor subsidiary's estate.  Id. at 842. Therefore, such action was properly subject to the automatic stay under Bankruptcy Code section 362.  Id. at 843; see also In re Southeast Banking Corp., No. 91-14561, 1994 Bankr. LEXIS 2389, at *2 (Bankr. S.D. Fla. Jul. 21, 1994) (debtor's interest in its NOLs "constitutes property of the estate within the scope of 11 U.S.C. § 541(a)(1) and is entitled to the protection of the automatic stay imposed pursuant to 11 U.S.C. § 362(a)(3)").

37.     Because the Debtors' NOLs are property of their estates, this Court has the authority under Bankruptcy Code section 362 to enforce the automatic stay by restricting any Transfer of Equity Securities that could adversely impact the Debtors' ability to use this valuable asset.  Courts ordering such relief generally have done so by imposing notice and objection requirements regarding any proposed transfer of shares on a person whose holdings of such shares exceeds (or would exceed as a result of the proposed transfer) a certain threshold amount. See, e.g., In re MolyCorp, Inc., Case No. 15-11357 (CSS) (Bankr. D. Del. July 17, 2015) [Docket No. 226]; In re Cal Dive Int'l, Inc., Case No. 15-10458 (CSS) (Bankr. D. Del. Mar. 31, 2015) [Docket No. 179]; In re Sorenson Commc'ns, Inc., Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 26, 2014) [Docket No. 134]; In re The PMI Grp., Inc., Case No. 11-13730 (BLS) (Bankr. D. Del. Feb. 8, 2012) [Docket No. 154]; In re RadioShack Corp., Case No. 15-10197 (KJC) (Bankr D. Del. Feb. 9, 2015) [Docket No. 160]; In re Overseas Shipholding Grp., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Dec. 7, 2012) [Docket No. 149]; In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008) [Docket No. 279]; In re Legend Parent, Inc., Case No. 14-10701 (REG) (Bankr. S.D.N.Y. May 9, 2014); In re Hawker Beechcraft, Inc., Case No. 12-11873 (Bankr. S.D.N.Y. June 27, 2012); In re MR Corp., Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Jan. 27, 2012); In re Eastman Kodak Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 15, 2012); In re Hostess Brands, Inc., Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 27, 2012).

38.     The Equity Transfer Procedures are designed to protect the Debtors from losing the benefit of all or any portion of their NOLs in connection with Transfers of Equity Securities prior to the effective date of a plan of reorganization that may (a) trigger an ownership change not within the scope of sections 382(l)(5) or 382(l)(6) of the IRC, (b) preclude the Debtors from

taking advantage of the more favorable NOL utilization rules under sections 382(l)(5) or 382(l)(6) of the IRC or (c) severely limit the Debtors' ability to use their NOLs to shelter any taxable income or gain resulting from any sale of assets in the course of these Chapter 11 Cases. The Debtors require a mechanism to monitor and possibly object to ownership changes resulting from Transfers of Equity Securities and/or loss of eligibility for the Section 382(l)(5) Safe Harbor resulting from trading in Claims in order to be able to craft a plan of reorganization that permits the Debtors to use their NOLs to the fullest extent possible to reduce federal income taxes on their post-reorganization income or to shelter any taxable income or gain resulting from any sale of assets, thereby maximizing value for all stakeholders.

39.    Moreover, it is in the best interests of the Debtors, their estates, and their stakeholders to restrict Transfers that could result in an ownership change prior to consummation of a plan of reorganization and to establish the Record Date with respect to trading in Claims. Transfers of Equity Securities are limited only for parties who are or might become 5% shareholders. Because Transfers of Equity Securities by or into the hands of 5% shareholders before the effective date of a plan could trigger an ownership change that would impose a severe limitation on the Debtors' use of their NOLs on an annual basis, such Transfers also pose a threat to the value of their NOLs even if the Debtors later satisfied the requirements of sections 382(l)(5) or 382(l)(6) of the IRC in connection with a second ownership change resulting from a plan. An ownership change must occur pursuant to consummation of a plan in order for the Debtors to qualify for the Section 382(l)(5) Safe Harbor and/or for the favorable valuation rules of section 382(l)(6) of the IRC.

40.    Relief similar to that requested herein with respect to equity security transfers has been granted by bankruptcy courts in other chapter 11 cases in this district and elsewhere. See,

- 16 -

e.g., In re MolyCorp, Inc., Case No. 15-11357 (CSS) (Bankr. D. Del. July 17, 2015) [Docket No. 226]; In re Cal Dive Int'l, Inc., Case No. 15-10458 (CSS) (Bankr. D. Del. Mar. 31, 2015) [Docket No. 179]; In re Sorenson Commc'ns, Inc., Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 26, 2014) [Docket No. 134]; In re The PMI Grp., Inc., Case No. 11-13730 (BLS) (Bankr. D. Del. Feb. 8, 2012) [Docket No. 154]; In re RadioShack Corp., Case No. 15-10197 (KJC) (Bankr D. Del. Feb. 9, 2015) [Docket No. 160]; In re Overseas Shipholding Grp., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Dec. 7, 2012) [Docket No. 149]; In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008) [Docket No. 279].

41.    Additionally, bankruptcy courts in this district have granted relief similar to that requested herein with respect to the establishment of a record date for notice and sell-down procedures for trading in claims.  See, e.g., In re MolyCorp, Inc., Case No. 15-11357 (CSS) (Bankr. D. Del. July 17, 2015) [Docket No. 226]; In re Cal Dive Int'l, Inc., Case No. 15-10458 (CSS) (Bankr. D. Del. Mar. 31, 2015) [Docket No. 179]; In re RadioShack Corp., Case No. 15-10197 (KJC) (Bankr D. Del. Feb. 9, 2015) [Docket No. 160]; In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008) [Docket No. 279].  The Debtors submit that the present circumstances warrant similar relief in these chapter 11 cases.

**B.    The Equity Transfer Procedures and Record Date Notice Are Narrowly Tailored**

42.    The establishment of the Equity Transfer Procedures will not bar all Transfers of Equity Securities; rather, the Equity Transfer Procedures will only impact those types of Transfers that pose a serious risk to the Debtors' NOLs under the IRC section 382 ownership change test.  Further, the Equity Transfer Procedures will only be in effect during the pendency of these Chapter 11 Cases.  As such, the requested relief is narrowly tailored to allow the Debtors to preserve their ability to seek substantive relief if it appears that a proposed Transfer will

jeopardize the use of their NOLs.  The Equity Transfer Procedures would otherwise permit Transfers of Equity Securities to continue unaffected, subject to applicable law.

43.    As discussed above, the Equity Transfer Procedures are necessary to preserve the value of the Debtors' NOLs should an ownership change occur outside the context of a chapter 11 plan.  But the Equity Transfer Procedures may not be sufficient if, pursuant to a plan of reorganization, (a) unsecured creditors receive sufficient equity to trigger an "ownership change" under section 382 of the IRC and (b) the Debtors are unable to utilize the Section 382(l)(5) Safe Harbor.

44.    To avoid that scenario, the Debtors may need to seek the entry of a Sell-Down Order.  In the meantime, the Debtors need to be able to set and provide notice of the Record Date to give all creditors who may be subject to Sell-Down Procedures advance notice and ensure that the value of the Debtors' NOLs will be preserved.

45.    Approval of the proposed Record Date does not constitute approval of the Sell-Down Procedures and does not restrict trading in Claims.  Importantly, the Interim Order will not impose a burden on any person or entity because the Interim Order is designed to provide notice to claimholders and claims traders (a) of the Record Date, (b) that the Threshold Amounts will be measured as of the Record Date, and (c) that Claims may ultimately be subject to sell-down if the Debtors determine that a Sell-Down Order is necessary to preserve the value of their NOLs. If the Debtors do later determine that a Sell-Down Order is necessary, the Debtors will file a separate motion requesting entry of a Sell-Down Order applicable to certain Claims traded on or after the Record Date.

**C.**  **Interim Relief Is Necessary to Avoid Irreparable Harm to the Debtors**

46.     After a NOL is limited under section 382 of the IRC, its use is limited forever, and after an equity interest is transferred, it cannot be undone.  The relief sought herein is necessary to avoid an irrevocable loss of the Debtors' NOLs and the irreparable harm that could be caused by unfettered Transfers of Equity Securities, which, unmonitored, could jeopardize the Debtors' ability to offset taxable income with their NOLs, thereby risking the Debtors' ability to increase liquidity.

47.     Absent establishing the Record Date at this time, it is unlikely that the Debtors would be able to implement the Sell-Down Procedures in any effective fashion to enable them to maximize the value of their NOLs.  Whether or not the Debtors seek and the Court ultimately enters a Sell-Down Order, setting the Record Date now is essential to adequately protect the Debtors' option to preserve the value of their NOLs without affecting any parties in interest.

48.     Accordingly, the Debtors submit that, absent the interim relief granted in the Interim Order, the Debtors and their estates could suffer immediate and irreparable harm.  If the Court does not grant the relief sought in this Motion on an interim basis, holders of Equity Securities could transfer such Equity Securities before the protective restrictions herein are implemented by the Court, and the Record Date would not be established for purposes of trading in Claims, risking the Debtors' ability to use their NOLs to maximize value and benefit their estates.  Therefore, the Debtors request that the procedures described herein be approved immediately on an interim basis.

**Notice**

49.     The Debtors have provided notice of this Motion to: (a) the U.S. Trustee; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) JCF AFFM Debt Holdings L.P.; (d) the Internal

51501844.1

Revenue Service; (e) the Securities and Exchange Commission; (f) the Illinois Department of Insurance; (g) the Louisiana Department of Insurance; (h) the New York Department of Financial Services; (i) the Michigan Department of Insurance and Financial Services; (j) The Bank of New York Mellon Trust Company, N.A., solely in its capacities as the trustee for the Debtors' Junior Subordinated Debt Securities due March 15, 2035, Junior Subordinated Debt Securities due June 15, 2035, and Floating Rate Subordinated Notes due March 15, 2035; and (k) all parties entitled to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, under the circumstances, no other or further notice is required.

## **No Prior Request**

50.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order attached hereto as **Exhibit A**, granting the relief requested in the Motion, (b) schedule a Final Hearing on the Motion, to be held if there is an Objection to the relief requested in the Motion being granted on a final basis; and (c) grant such other and further relief as the Court deems appropriate.

Dated: October 14, 2015          Respectfully submitted,
   Wilmington, Delaware

POLSINELLI PC

 */s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Jarrett Vine (Del. Bar No. 5400)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
jvine@polsinelli.com

-and-

MCDERMOTT WILL & EMERY LLP
Timothy W. Walsh (*pro hac vice* pending)
Darren Azman (*pro hac vice* pending)
340 Madison Avenue
New York, New York 10173-1922
Telephone:(212) 547-5400
Facsimile: (212) 547-5444
Email: twwalsh@mwe.com
   dazman@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*