**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| AFFIRMATIVE INSURANCE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 15-12136 (CSS) Jointly Administered |
| Debtors. | ) | **Proposed Hearing Date: January 19, 2016 at 1:00 p.m.** **Proposed Objection Deadline: January 12, 2016 at 4:00 p.m.** |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF AFFIRMATIVE INSURANCE HOLDINGS, INC., *ET AL.* FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE PURSUANT TO 11 U.S.C. § 1112(b)**

The Official Committee of Unsecured Creditors of Affirmative Insurance Holdings, Inc., *et al.* (the "Committee") submits to this Court its motion (the "Motion") requesting that the Court enter an order converting the Debtors' Chapter 11 Cases (as defined below) to cases under chapter 7 of Title 11, United States Code (the "Bankruptcy Code"), and as grounds therefor, shows this Court as follows:

**PRELIMINARY STATEMENT**

1. The Committee brings this Motion to convert the Debtors' cases because the Debtors have no business to reorganize, the Debtors' estates are administratively insolvent, and, currently, the Debtors have no hope of confirming a feasible plan of reorganization or liquidation. Converting the Chapter 11 Cases at this juncture will allow an independent Chapter 7 trustee, not influenced by the Debtors' management, to pursue and seek to monetize unliquidated and contingent assets for the benefit of the Debtors' creditors, including holders of

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Affirmative Insurance Holdings, Inc. (0432); Affirmative Management Services, Inc. (7252); Affirmative Services, Inc. (7255); Affirmative Underwriting Services, Inc. (7250); Affirmative Insurance Services, Inc. (8823); Affirmative General Agency, Inc. (2345); Affirmative Insurance Group, Inc. (7246); and Affirmative, L.L.C. (2347). The location of the Debtors' corporate headquarters and the service address for all Debtors is 150 Harvester Drive, Suite 250, Burr Ridge, Illinois 60527

the Debtors' approximately $100 million in unsecured debt (the Committee's constituents). Furthermore, conversion will prevent the Debtors' estates from incurring even more Chapter 11 administrative expenses when no parties have asserted a willingness to fund such expenses.

2. The typical downsides to conversion are not present here. There is no risk of losing valuable institutional knowledge because the Debtors are mere shells and, as of December 31, 2015 (if not now), the Debtors will have no employees except for two executives who continue to earn a combined $71,000 per month notwithstanding the fact that the Debtors no longer conduct any business. The Debtors do not have the ability to meet the requirements of section 1129(a) of the Bankruptcy Code, and therefore, are not able to confirm a plan.[2]

3. Moreover, the Debtors' stated reason for filing Chapter 11, rather than Chapter 7, namely the monetization of its NOLs, has proven to be a fool's errand. Having spent the last 10 weeks exploring the possibility of monetizing NOLs, there simply is no current strategy for achieving the same. These cases are straight liquidations with no benefit whatsoever to remaining in Chapter 11 and incurring costs to the estate that would not be incurred in Chapter 7.

4. For these reasons, and those that follow, the Chapter 11 Cases should be converted to cases under Chapter 7 of the Bankruptcy Code.

## BACKGROUND

### A. Procedural Background

5. On October 14, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, thereby commencing

---

2 The Debtors are holding approximately $8.5 million that is purportedly subject to the lien of JCF AFFM Debt Holdings L.P. ("JCF"). The Committee believes that the alleged claim of JCF is subject to recharacterization as equity, among other infirmities. Accordingly, the Committee does not concede the amount of JCF's claim or that JCF holds an unavoidable, perfected lien in the assets of the Debtors. However, litigating these issues will take months, if not longer, to resolve and, in the meantime, any funds held by the Debtors that are arguably subject to JCF's lien could not be used to fund a Chapter 11 plan.

the above-captioned cases (the "Chapter 11 Cases"). The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. On October 19, 2015, this Court entered an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1.

6.   On October 30, 2015 (the "Formation Date"), the Office of the United States Trustee for Region 3 appointed a statutory committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 78]. The current members of the Committee are: (a) Alesco Preferred Funding X, Ltd.; (b) Alesco Preferred Funding VI, Ltd.; (c) Trapeza CDO IX, Ltd.; (d) Trapeza Edge CDO, Ltd.; and (e) The Bank of New York Mellon Trust Co., N.A, as Indenture Trustee.

**B.   Events Leading to the Debtors' Chapter 11 Filings**

7.   As set forth in greater detail in the Declaration of Michael J. McClure in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "McClure Declaration"), the Debtors are largely "shell" holding company with minimal operations. *See* D.I. 2 ¶¶ 21-24. Historically, the Debtors operated through certain wholly owned, regulated subsidiaries, which are licensed to write insurance policies in various states. *Id.* ¶ 24. These regulated subsidiaries, however, have recently been placed into state receiverships or rehabilitation proceedings, creating separate estates and divesting the Debtors of control over these entities. Inasmuch as these regulated subsidiaries possess the certificates of authority necessary to transact insurance business and issue policies, the Debtors are no longer able to perform these functions and thus lack any meaningful operations.

8. In recognition of the foregoing, and due to the staggering amount of debt on their books, the Debtors opted on the Petition Date to commence the Chapter 11 Cases.

**C. The Debtors' Financial Condition**

9. On November 13, 2015, the Debtors filed their Initial Monthly Operating Report [D.I. 97] (the "Report"), which was signed by their CEO under penalty of perjury. Pursuant to the Report, at the end of November 2015, the Debtors were projected to hold only $253,000 in cash. *See also* Unofficial Transcript of October 19, 2015 Hearing, a copy of which is attached hereto as Exhibit B, 10:19-24 (referencing "$300,000 of unencumbered cash" and pre-funded retainers and stating that "we have a short runway, we believe, that we could run the Chapter 11 before we need to get to a discussion of where we go next"). With no income anticipated,[3] but $71,000 in monthly payroll expenses for the Debtors' two remaining executives (an amount the Committee considers grossly excessive in light of the minimal tasks required by such executives since the Debtors' bankruptcies were filed), the Debtors' unencumbered cash is projected to decrease to $168,000 by the end of December 2015; to $63,000 by the end of January 2016; and to $3,000 by the end of February 2016. *Id.* at 2.[4] The Debtors' recently filed schedules are consistent with the budget, in that they reveal no significant additional unencumbered assets that could be used to pay administrative expenses.

10. Crucially, however, the Debtors' budget did not include professional fees for which the Debtors' estates are liable.[5] From the Petition Date through November 2015, the

---

3 Affirmative Insurance Company ("AIC") has agreed to fund the actual costs of the Debtors' few remaining employees through December 31, 2015. Therefore, this arrangement does not result in any income for the Debtors.

4 It is unknown whether the Debtors' budget shows $36,000 in executive compensation because the Debtors only budgeted for half of February or because the Debtors expect that their executive compensation burden will be reduced in February.

5 A footnote in the budget suggested that Debtors' professionals would incur $500,000 in fees and expenses through February 2016 and the Committee's professionals would incur $200,000 in fees and expenses during the

Debtors' professionals incurred at least $356,000 in fees and expenses.[6] Amounts incurred during this time period by the Debtors' lead counsel, special counsel, and financial advisors through November 2015 can be satisfied by pre-petition retainers, and approximately $85,000 of their retainers would remain. However, by now, fees incurred by those professionals, including unpaid hold-backs, have likely exceeded the remainder of the retainers. The Debtors' local counsel has exhausted its retainer and is owed approximately $51,219.85 from the Debtors' estates through November 2015. At the same time, substantial liabilities exist in connection with the fees and expenses of the Committee's professionals. In short, the Chapter 11 Cases are currently administratively insolvent.[7]

**D. Plan Negotiations**

11. Recently, the Debtors, the Debtors' secured lender, the Illinois insurance regulator, and the Committee attempted to negotiate the terms of a plan of liquidation. However, with no source of funding to pay administrative expenses and priority tax claims, it became apparent that a plan cannot be confirmed.

**JURISDICTION AND BASIS FOR RELIEF**

12. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicate for the relief requested in this Motion is section 1112(b) of the Bankruptcy Code.

---

same period. These estimates will likely prove insufficient for the Debtors' professionals and have already proven insufficient for the Committee's professionals as noted below.

6 The Committee did not incur professional fees and expenses for October 2015 and have not submitted monthly fee applications for November 2015, but expect that their fees and expenses through December 2015 will exceed $275,000, largely associated with analyzing claims against JCF and others. This analysis can be shared with a Chapter 7 trustee for prosecution.

7 Similarly, although not administrative expenses, the Debtors may have significant tax obligations which constitute priority tax claims, and which must be satisfied pursuant to section 1129(a)(9) of the Bankruptcy Code in order to confirm a plan.

**RELIEF REQUESTED**

13. By this Motion, the Committee requests entry of an order, substantially in the form attached hereto as Exhibit A, converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

**BASIS FOR RELIEF**

14. Pursuant to section 1112(b)(1) of the Bankruptcy Code:

> Except as provided in paragraph (2) and subsection (c) …, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1). Accordingly, where "cause" is found to exist, and upon the request of a party in interest, a court is required to convert a Chapter 11 case to Chapter 7, so long as "unusual circumstances" are not present. *See In re Reserves Resort, Spa & Country Club LLC*, No. 12-13316(KG), 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013) ("The statute thus makes conversion mandatory once a court finds, as the Court has done here, any of the elements of 'cause.'"). Thus, although the moving party has the burden to show "cause," once that showing has been made, a court must grant the motion for conversion, absent circumstances not normally found in Chapter 11 cases.

15. Although the Bankruptcy Code provides a list of what constitutes "cause," *see* 11 U.S.C. § 1112(b)(4), the list is not exhaustive. *See In re NuGelt, Inc.*, 142 B.R. 661, 665 (Bankr. D. Del. 1992) ("the court is not limited to the statutory examples"); *In re Young*, 76 B.R. 376, 378 (Bankr. D. Del. 1987) ("cause is not limited to the enumerated grounds of § 1112(b)"). Cause may be determined based on the facts and circumstances of the case. *See In re NuGelt, Inc.*, 142 B.R. at 665 ("cause may be determined from the facts and circumstances of the case");

*In re Young*, 76 B.R. at 378 (the determination of "whether cause has been shown must be made on a case-by-case basis"); *see also In re Prosser*, 388 F. App'x 99, 99-100 (3d Cir. 2010) ("The bankruptcy court has broad discretion in deciding whether to ... convert a chapter 11 case.") (citing *Loop Corp. v. United States Trustee*, 379 F.3d 511, 515 (8th Cir. 2004)). Thus, while each of the examples set forth in section 1112(b)(4), standing alone, may provide cause for conversion of a case to Chapter 7, courts may also look beyond these examples in their discretion.

16. Cause for conversion exists under section 1112(b)(4)(A) because there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The *Eighth Circuit Court of Appeals* held that this factor is satisfied where a Chapter 11 debtor is no longer operating and has failed to negotiate a confirmable Chapter 11 plan with its creditor constituencies. *Loop Corp.*, 379 F.3d at 516. Other authorities have reached similar conclusions. *See, e.g.*, *In re Reserves Resort, Spa & Country Club*, 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013) (converting cases based, in part, on the fact that, although debtors had some assets, they lacked financing, were accruing administrative expenses and debt and were not rehabilitating their assets); *In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010) (noting that no heightened showing need be made and "[I]t is not necessary that the losses to the estate be large"); 7 *Collier on Bankruptcy* § 1112.04[6][a][i] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) ("If the … debtor is operating with sustained negative cash flow … after the commencement of the case, [this fact] is sufficient to justify a finding of 'substantial or continuing loss to … the estate'").

17. In *Loop Corporation,* the debtor had no operations and its sole remaining assets consisted of cash, litigation claims against its accounting firm and net operating losses. Further,

the parties had been unable to negotiate a consensual plan of reorganization. The primary dispute was whether the debtor should pursue its litigation claims against its accountants with its remaining cash, or distribute that cash to creditors. 379 F.3d at 514. The Office of the United States Trustee moved to convert the case to a Chapter 7 liquidation and the bankruptcy court granted the motion. The court of appeals found that cause had been established under section 1112(b)(4)(A) because the debtor continued to incur administrative expenses, no longer had an operating business which it could rehabilitate and had failed to confirm a plan. *Id.* at 516. In affirming the conversion, the Eighth Circuit specifically noted that "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow – including that resulting only from administrative expenses – effectively comes straight from the pockets of the creditors." *Id.*

18.   A similar fact pattern exists here. Except for the funds purportedly subject to JCF's lien (the "Disputed Funds"), the Debtors' only significant assets are litigation claims. These claims (in addition to resolution of the Disputed Funds) will each take months or years to resolve.[8] Not only do the Debtors continue to incur significant administrative expenses in the form of professional fees and payroll, such administrative expenses are likely to materially increase if these cases are not converted. Among other things, the Debtors may ignore valuable causes of action such as those against directors and officers, while seeking to confirm a plan of reorganization or otherwise taking action unsupported by creditors that would generate continuing and/or substantial administrative expenses. Given that the Debtors have no income,

---

[8] Among other things, section 1129 of the Bankruptcy Code provides that a plan can only be confirmed if administrative expenses are paid in full upon the effective date of the plan and priority tax claims are paid in full through regular installments ending not later than five years after the order for relief is entered. *See* 11 U.S.C. § 1129(a)(9)(A), (C). Given the lack of liquid and undisputed assets, there is no way to meet the requirements of section 1129.

the costs associated with these efforts would be paid directly out of creditors' recoveries. Creditors should not be forced to bear this burden.

19. This is particularly true, given that the only possible justification for remaining in Chapter 11 – preservation of net operating losses ("NOLs") – is an unlikely result. The Debtors have not identified any entity that, in exchange for the use of the NOLs, is willing to contribute funds sufficient to confirm a Chapter 11 plan. Moreover, AIC's regulator has claimed ownership of the NOLs. Finally, NOLs cannot simply be sold, and thus there are very limited circumstances under which they can be monetized. *See* 11 U.S.C. § 382(l)(5); *see also* 11 U.S.C. § 1129(d). Conversion is appropriate to avoid the Debtors' wagering any remaining funds on such a scheme. *See Loop Corp.*, 379 F.3d at 516 (purpose of conversion under section 1112(b) is "to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'"); *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (dockets should not be clogged with "visionary or impracticable schemes for resuscitation .... Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization.") (internal citations omitted). In this situation, where the Debtors' "existing assets and receivables are diminishing and there is no likelihood of future profits," creditors are left with no hope but to "cut their losses by forcing the Debtor[s] to liquidate as soon as possible." *In re LG Motors, Inc.*, 422 B.R. 110, 117 (Bankr. N.D. Ill. 2009). These cases therefore represent "precisely the situation that Section 1112(b)(1) and (4)(A) were designed to protect creditors from." *Id.*

20. In addition, there is no reasonable likelihood of rehabilitation. This element of section 1112(b)(4)(A) references "the debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516; *see also In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y.

2003) ("rehabilitation means to put back in good condition and reestablish on a sound basis"). Rehabilitation does not necessarily denote reorganization, which could involve liquidation. Instead, rehabilitation signifies something more: "that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." *In re AdBrite*, 290 B.R. at 216. Inability to fund a plan would, of course, signify that this requirement was not satisfied. *See In re Young*, 76 B.R. at 378 (dismissing case based, in part, on the debtor's inability to fund a plan).

21. The Debtors here are, and have been, debtors in possession only in a technical sense. They have no material operations or going concern value and their assets consist mainly of a small amount of cash and unliquidated causes of action that can be realized just as effectively in Chapter 7 as in Chapter 11. There is no reasonable chance that the Debtors will be reestablished on a secure financial basis, with cash flows to satisfy their current obligations. Likewise, as the Debtors have no "business" following the seizure of their operating subsidiaries and the transition of their remaining employees to AIC, there will be no restoration of the viability thereof. Such circumstances, alone or in the aggregate, constitute "cause" to convert these cases pursuant to section 1112(b)(4)(A). Additionally, the Debtors' administrative expenses already exceed the value of any remaining unencumbered, liquidated assets. In view of the foregoing, the Committee submits that "cause" has been established to convert the Debtor's Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.[9]

---

[9] Although administrative insolvency is not identified as cause for conversion to Chapter 7 under 11 U.S.C. § 1129(b)(4), courts have found that administrative insolvency does constitute cause for conversion. *See In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) ("the Debtors' administrative insolvency constitutes cause to convert these cases."); *see also In re Bartmann*, 310 B.R. 663 (10th Cir. BAP 2004); *In re Desmond*, 331 B.R. 42, 44 (Bankr. D.N.H. 2005). As noted above, the Debtors projected that as of the end of December they would only have $168,000 in unencumbered cash remaining in their estate. The fees and expenses of the professionals of the Debtors and the Committee greatly exceed this amount. There is currently no clear source of recovery of unencumbered assets that could fund the Debtors' Chapter 11 cases. As a result, the Debtors are administratively insolvent.

22. Once "cause" has been shown, the burden of proof shifts to the party opposing conversion to demonstrate "unusual circumstances" establishing that conversion is not in the best interests of the Debtors' creditors and bankruptcy estates. Unless the Debtors make this showing, the Court must convert the case. 11 U.S.C. § 1112(b)(1); *In re Riverbend Cmty., LLC*, No. 11-11771 KG, 2012 WL 1030340, at *3 (Bankr. D. Del. Mar. 23, 2012) (conversion of case is mandatory absent a showing of unusual circumstances once cause is established). The term, "'[u]nusual circumstances,' contemplates conditions that are not common in chapter 11 cases." *In re LG Motors*, 422 B.R. at 116. No conditions exist in these Chapter 11 Cases that could render "cause" overcome and conversion inappropriate. In fact, there do not appear to be any circumstances present here that would meaningfully distinguish these cases from other administratively insolvent Chapter 11 cases (holding company or otherwise), which are regularly converted to Chapter 7 liquidations. Accordingly, no unusual circumstances – and certainly none that establish that conversion is not in the best interests of the Debtors' estates or creditors – exist at this time, and the Debtors cannot sustain their burden to overcome "cause" shown to convert their Chapter 11 Cases to cases under Chapter 7.

**CONCLUSION**

23. For the reasons set forth above, and pursuant to section 1112(b) of the Bankruptcy Code, the Committee submits that the Chapter 11 Cases should be converted to cases under Chapter 7 of the Bankruptcy Code.

WHEREFORE, the Committee respectfully requests the entry of an order, pursuant to section 1112(b) of the Bankruptcy Code, converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code and granting such other relief as is just and proper.

Dated: December 30, 2015
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

/s/ Etta R. Mayers

Jeremy W. Ryan (DE Bar No. 4057)
Etta R. Mayers (DE Bar No. 4164)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd Meyers, Esq.
Colin M. Bernardino, Esq.
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Counsel to The Official Committee of Unsecured Creditors*